UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

FILED

00 JUN 27 AM 8: 17

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| TIMOTHY HICKS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. CV-99-S-2511-J |
| | ) |
| MALOY FORD LINCOLN | ) |
| MERCURY, | ) |
| | ) |
| Defendant. | ) |

ENTERED

JUN 2 7 2000

## MEMORANDUM OPINION

This action is before the court on defendant's motion for summary judgment. Upon consideration of the motion, briefs, evidentiary submissions, and pleadings, the court concludes it is due to be granted in part and denied in part.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing



sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally id.*; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court there is an absence of evidence to support the non-movant's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex Corporation*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593. The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

2

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict

3

for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

Plaintiff, Timothy Hicks, an African-American male, began his employment with defendant, Maloy Ford Lincoln Mercury, in Jasper, Alabama, in late March of 1999.  He was hired as an automobile salesman, and his duties included the sale of both new and used vehicles.  Plaintiff's initial supervisor was Keith Hamilton, a Caucasian male, who was defendant's New Car Sales Manager.

Plaintiff encountered numerous difficulties with Hamilton during the short time he worked under his supervision.  First, Hamilton instructed plaintiff and the only other salesman of African-American heritage, Earnest Meadows, to not socialize with

4

one another on the job.

> Mr. Hamilton told both Mr. Hicks and myself that we were
> not allowed to talk to each other at all, yet he never
> said anything to us when we were talking to white
> coemployees.  In fact, Mr. Hamilton told both Mr. Hicks
> and myself that if he caught us talking to each other
> that there was going to be "two unemployed black
> asses." [1]

Hamilton once sent plaintiff home from work, because he deemed plaintiff's shirt inappropriate attire:  he said "go home, don't come back, come back tomorrow when you know how to dress."[2] Hamilton also criticized plaintiff's choice of footwear:  he described them as "pimp daddy shoes," and ordered plaintiff to purchase a new pair of work shoes.[3]  Hamilton attempted to explain this incident by saying that he "also sent white employees home to change shoes."[4]

On the whole, plaintiff perceived a disparity between the way he was treated by Hamilton and the manner in which Hamilton dealt with white employees.

---

[1] Affidavit of Earnest Meadows, attached as Exhibit 2 to plaintiff's evidentiary submission in opposition to summary judgment (Doc. No. 26), at 2.

[2] Deposition of Timothy Hicks, attached as Exhibit 1 to plaintiff's evidentiary submission in opposition to summary judgment, at 82.  Plaintiff did not consider his button-down shirt inappropriate for work purposes.

[3] Again, plaintiff did not consider his shoes inappropriate.  Even so, defendant's owner and president, Robert Maloy, agreed that plaintiff's shoes were inappropriate.

[4] Affidavit of Keith Hamilton, attached as Exhibit D to defendant's evidentiary submission in support of summary judgment (Doc. No. 24), at ¶ 11.

Q.   Why do you think that?

A.   Because the other white guys that were there,
and also we got Pakistan — Andrew, they were all — they
wasn't treated that way, you know.  These guys to me were
treated with respect.

. . .

Q.   . . . Are there any other reasons why you think
he did these things to you because of your race?

A.   . . . It was quite obvious the guy had a serious
problem with me.  I mean, I didn't come in there with an
attitude. . . . And this guy just made it a point to —
just like I said, he just turned me off. . . . There were
times I would be sitting at my desk, man, and I can just
look over at him and he's sitting at the window, you
know, and I look over at him and he just give me this
look and just turn around and shrug as though he had just
seen the ugliest thing in the world.

. . .

Q.   And that was while you're still selling new
cars?

A.   . . . And man I had — and some people would
actually just drive off, you know, you're trying to just
talk to them and they say, hey, I'm not interested in
buying a car and they would leave.  And he would just
chew me out for that.  And other people he'll say, oh,
you'll catch another one.  You know, with me he just
would chew me out, man.  You know, why in the hell did
you let that guy leave. [5]

Hamilton ultimately barred plaintiff from selling new automobiles,

and plaintiff was reassigned to work exclusively for DeWayne

DeMedio, a Caucasian male who was defendant's Used Car Sales

---

[5] Plaintiff's deposition at 81, 85-86, 80-81.

Manager.[6]  Plaintiff recounted that event in deposition:

> And he just ... told me that ... he feel like that he and
> I ... couldn't do a car deal together, that's what he
> told me, a car deal together.  And I asked him what he
> meant by that.  And I told him, I said, you know because,
> of course, you know, he was pretty much of an expert
> salesman.  So, I would ask for his advice on things.  But
> he just told me that he didn't feel like I could — we
> could do a deal together.[7]

Plaintiff  surmised  that  defendant  sold  more  new  than  used

automobiles, and that being permitted to sell only used automobiles

thereby diminished his pay.[8]  For example, plaintiff recounted an

---

[6] Robert Maloy stated that all salespersons were supervised by either
Hamilton or DeMedio.  He further noted that one's designation as a member of the
new car or used car sales department may not necessarily curtail that
salesperson's ability to sell both types of automobiles.

> Q.    Okay.  Do the salespeople at Maloy -- if you're working
> in the new car department under the new car manager, Mr. Hamilton --
> would they sometimes switch over and sell used cars, or is there a
> pretty clear line between the two?
>
> A.    No.  They can sell used [as long] as it's approved by
> that manager.
>
> Q.    Is that the same for people who work under Mr. De[M]edio
> for the used cars?  They can come and sell new cars if it's
> approved?
>
> A.    Yes.  If the new car manager [Keith Hamilton] thinks
> they're confident to do so, then they will allow them.  Yes.

Deposition of Robert Maloy, attached as Exhibit B to defendant's evidentiary
submission in support of summary judgment, at 10-11 (emphasis supplied).
Hamilton denied that he formally transferred plaintiff to the used car sales
department.   That point is irrelevant, however, in light of the fact that
plaintiff ultimately was permitted to sell only those types of vehicles.

[7] Plaintiff's deposition at 38.

[8] Robert Maloy stated in deposition that defendant's salespersons generally
were compensated on a full commission, rather than salary, basis.

incident in which he was attempting to sell a used Ford Expedition. When the customers expressed interest in a new Ford Expedition, plaintiff was required to turn them over to another salesman in the new car department.  Plaintiff claimed he was the only employee not permitted to sell both new and used automobiles.

Plaintiff's transfer to the used car department did not diminish his conflict with Hamilton.  For example, during a day that plaintiff had taken off, DeMedio telephoned him at home and said he should be at work attempting to boost his sales.  Plaintiff declined the invitation, and told DeMedio he would see him the following day.  After the sales meeting the following morning, Hamilton pulled plaintiff to the side:

> He said come here a second.  I said, well, what do you
> want.  He said, well, I want you to know something.  His
> words to me were, to the best of my memory were — this
> is not a democracy where you guys vote as to whether or
> not you get a day off.  He told me that this is a "F"ing
> dictatorship and if I say you don't get a "F"ing day off,
> you don't get a "F"ing day off is what he told me.[9]

Plaintiff ultimately decided to resign his employment with defendant.  He informed Hamilton of that decision in the following manner:

> And I remember going to the office one day, and I did
> this, I went into the office and I told Keith — and this
> is before I actually quit, I was going to quit this day.

---

[9] Plaintiff's deposition at 42.

> ... And I reached over and I shook his hand.  I said,
> man, I said, you won. ... I said me and you both can't be
> here the way you treat me. ... I told him, I said, you're
> the most arrogant and ... disrespectful guy I've ever met
> in my life. ... And he went to cussing and told me ... to
> get the "F" on down the road, get out of there right
> then. ... And then he told me to take my black ass on
> down the road, you know. [10]

Plaintiff's last day of employment with defendant was May 7, 1999,

approximately six weeks after he began.

### III. DISCUSSION

**A.    Introduction**

Plaintiff commenced this action on September 17, 1999,

alleging that defendant violated 42 U.S.C. § 1981 by discriminating

against him in the terms and conditions of employment, and by

terminating him, because of his race.  42 U.S.C. § 1981 provides

for equal rights under the law, and states that:

> All persons within the jurisdiction of the United
> States shall have the same right in every State and
> Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal benefit
> of all laws and proceedings for the security of persons
> and property as is enjoyed by white citizens, and shall
> be subject to like punishment, pains, penalties, taxes,
> licenses, and exactions of every kind, and to no other.
>
> . . .
>
> For purposes of this section, the term "make and
> enforce contracts" includes the making, performance,
> modification, and termination of contracts, and the

---

[10] *Id.* at 58-59.

> enjoyment of all benefits, privileges, terms, and
> conditions of the contractual relationship.
>
> . . .
>
> The rights protected by this section are protected
> against impairment by nongovernmental discrimination and
> impairment under color of State law.

42 U.S.C. § 1981(a)-(c).

When § 1981 is employed to address racially discriminatory treatment in the workplace, the legal standards associated with Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.*, become relevant. *See Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060 (11th Cir. 1994); *see also Crawford v. Western Electric Company*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (noting that § 1981 "is a parallel remedy against discrimination which may derive its legal principles from Title VII") (citation omitted).[11] Under that rubric, plaintiff may establish disparate treatment based on race through either direct or circumstantial evidence.[12]

---

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[12] *See infra* notes 17 & 18. Statistical evidence may also be employed to establish an employer's intent to discriminate. *See, e.g.,* Wilson v. AAA Plumbing Pottery Corporation, 34 F.3d 1024, 1027 (11th Cir. 1994). Plaintiff proffers no such evidence, however.

10

### B.   The Scope of Plaintiff's Claims

Plaintiff fails to specify exactly how defendant discriminated against him on the basis of race.   Rather, plaintiff claims discrimination in the catch-all phrase "terms and conditions" of employment.   He   further   contends   defendant   harbored   a discriminatory animus when terminating him.   The court addresses those contentions in reverse order.

### 1.   Discriminatory termination

Defendant did not terminate plaintiff; rather, he resigned.

>       Q.   Now, you ultimately quit; is that correct?
>
>       A.   Right. [13]

Plaintiff attempts to sidestep this admission by arguing that Hamilton's statements to the effect that he should "get the 'F' on down the road," and "take [his] black ass on down the road," constituted a termination.   That argument fails.   Plaintiff had decided to resign before he approached Hamilton, and the record does not indicate the exchange with Hamilton hastened plaintiff's decision to quit.   Accordingly, plaintiff's claim of unlawful termination fails, and is due to be dismissed.

Plaintiff alternatively argues that he was constructively discharged.   Such an independent claim is wholly absent from

---

[13] Plaintiff's deposition at 54.

11

plaintiff's pleadings.[14]   It is not the duty of this court "to fabricate a claim that a plaintiff has not spelled out in his pleadings." *Maniccia v. Brown*, 171 F.3d 1364, 1367 n.1 (11th Cir. 1999) (citing *Case v. State Farm Mutual Automobile Insurance Company*, 294 F.2d 676, 678 (5th Cir. 1961)).

Even if this court strained to read a claim of constructive discharge into plaintiff's complaint, it nevertheless would be dismissed.   "To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in [his] position would have been compelled to resign.'" *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (quoting *Thomas v. Dillard Department Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997)). Plaintiff, who remained an employee of defendant only for six weeks, fails to make this objective showing.   *Compare Morgan v. Ford*, 6 F.3d 750, 755-56 (11th Cir. 1993) (plaintiff, who was subjected to sexual harassment by supervisor for two separate

---

[14] Such a claim arguably may be inferred from that portion of plaintiff's deposition describing how he approached Hamilton, once he had decided to resign, and informed the supervisor that he had "won," because plaintiff could not work for someone so arrogant and disrespectful. *See id.* at 58-59. Even so, plaintiff never moved to amend his complaint, to assert such a claim.   Moreover, the time for supplementing plaintiff's complaint with additional claims or contentions has long passed.   *See* Amended Scheduling Order (Doc. No. 13) entered on March 6, 2000, at ¶ 1 ("No further causes of action may be added by plaintiff(s).").

periods of employment totaling approximately one year, created genuine issue of material fact regarding her constructive discharge claim). The incidents described by plaintiff, while certainly crude, offensive, and unpleasant, cannot be deemed intolerable. Moreover, plaintiff does not contend that Hamilton's boorish behavior affected his ability to sell automobiles. In fact, plaintiff claimed he was doing a good job on the date he decided to resign.[15] Plaintiff's reassignment to the sale of used automobiles, discussed further *infra*, also cannot be considerable an intolerable condition of employment, especially given the fact that plaintiff had worked for defendant for such a short period. In sum, this court will not entertain any claim of racial discrimination relating to plaintiff's cessation of employment with defendant.

## 2. Discriminatory "terms and conditions" of employment

### a. Racially hostile work environment

Plaintiff also did not expressly contend, either in his complaint or during deposition, that he was subjected to a racially hostile work environment. Accordingly, such a claim is due to be dismissed. *See Maniccia*, 171 F.3d at 1367 n.1.

---

[15] Plaintiff stated in deposition that he "enjoyed [his] job" at the time of resignation, and that he had sold anywhere from three to five used automobiles during the short time he worked in the used car department. *See* Plaintiff's deposition at 77, 76.

13

Such a claim, even had it been asserted, still would fail on the merits. A necessary element of proof in a hostile work environment case is that the alleged harassment was so severe and pervasive as to alter the plaintiff's working conditions. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). A plaintiff must show not only that he subjectively perceived his work environment to be hostile, but also that the conduct creating this environment was sufficiently severe or pervasive as to make his perception objectively reasonable. *See id*. Factors to consider in making that assessment include: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and, whether it unreasonably interferes with an employee's work performance. *See id*. at 23, 114 S.Ct. at 371. Application of all those factors counsels against retention of a racially hostile work environment claim in this case.

The evidence in this case reveals that plaintiff has failed "to delineate a minimum level of severity or pervasiveness necessary for harassing conduct to constitute discrimination in violation of [§ 1981]." *Mendoza v. Borden, Inc.*, 195 F.3d 1238,

14

1246 (11th Cir. 1999) (*en banc*).  Plaintiff did not remain at his job long enough to establish that the allegedly discriminatory conduct was pervasive.  Plaintiff has not indicated he felt physically threatened by Hamilton's treatment of him.  Plaintiff contends he was performing his job duties in a satisfactory manner on the date he resigned his employment.  While the statements made by Hamilton unquestionably are crude and offensive, they do not rise to the level that § 1981 liability is implicated.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (noting that "off hand comments" and "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment").

**b.    Disadvantageous transfer or change in job assignment**

To state a claim for disparate treatment under § 1981, plaintiff must initially establish that defendant initiated a racially-motivated employment action that was adverse to him. Plaintiff contends defendant's decision to reassign him to the sale of used automobiles was sufficiently adverse to implicate protection under § 1981.  He points to the fact that defendant sold more new than used vehicles, and asserts that his earning capacity was reduced as a result of this decision.  Plaintiff further

contends he was the only employee limited to the sale of used automobiles.  Thus, a dispositive issue in this case centers on whether defendant's "transfer"[16] of plaintiff to the used car sales department was sufficiently adverse to state a claim under § 1981.

A number of federal statutes, including § 1981, Title VII, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, prohibit wrongful discrimination in the "terms and conditions" of employment.  Accordingly, those federal statutes prohibit "a broad variety of adverse employment actions, whenever those actions are taken for a prohibited reason." *McNely v. Ocala Star-Banner Corporation*, 99 F.3d 1068, 1077 (11th Cir. 1996) (ADA case).  The Eleventh Circuit has indicated that a district court's analysis of the adverse employment action issue should take into account conclusions reached with respect to other relevant employment discrimination laws.  *See Doe v. DeKalb County School District*, 145 F.3d 1441, 1448 (11th Cir. 1998) ("Moreover, our precedents interpreting these employment discrimination laws have

---

[16] Regardless of whether plaintiff's relegation to the sale of used automobiles is characterized as a transfer or change in job assignment, the analysis *infra* applies.  *See* Alexander v. Fulton County, Georgia, 207 F.3d 1303, 1344 (11th Cir. 2000) (observing that same legal standards apply in considering transfers and alterations in job assignments).  This court will use those terms interchangeably to describe defendant's limitation of plaintiff to the sale of used automobiles.

16

often relied on the same 'adverse employment action' concept that is an essential element of a *prima facie* ADA case."). *Cf. Smith v. Alabama Department of Public Safety*, 64 F. Supp. 2d 1215, 1221 (M.D. Ala. 1999) (applying adverse employment action analysis from *Doe* to action brought under Title VII).

In *Doe*, the Eleventh Circuit clarified the analysis that must be undertaken to determine whether a contested employment decision is sufficiently adverse to warrant scrutiny under federal employment discrimination laws. The narrow issue before the *Doe* court was whether the plaintiff's subjective belief that a transfer was adverse was sufficient proof of "adversity." The *Doe* court concluded it was not, and committed the adverse employment action analysis to an objective standard:

> Having determined that we are not bound to a subjective standard, we adopt an objective test: An ADA plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse. In our view, this test best reflects our employment discrimination doctrine and precedents.
>
> ...
>
> As in the Eleventh Circuit, all of the cases that have found a transfer to be adverse appear to have based their conclusions on objective factors. ... In other words, our sister circuits have only held transfers to be adverse where the transfers were objectively equivalent, at least to some degree, to demotions.

17

*Doe*, 145 F.3d at 1448-49, 1450 (reiterating that weight of authority leads to conclusion that "purely lateral" transfers do not constitute adverse employment actions). *See also Smith*, 64 F. Supp. 2d at 1221-22 (finding that Title VII plaintiff could not establish adverse employment action, because he suffered no loss in pay, benefits, or classification, only great embarrassment).

Applying the *Doe* test, and viewing the facts in a light most favorable to plaintiff, this court concludes defendant's decision to limit the scope of plaintiff's work duties solely to the sale of used automobiles was sufficiently adverse to warrant scrutiny under § 1981. A reasonable person would have viewed the alleged reduction in earning potential as disadvantageous. The court recognizes that plaintiff's tenure with defendant was brief, and that he was limited to the sale of used vehicles for only a portion of that time. This leads to the conclusion that plaintiff's damages calculus, *i.e.*, the difference between the amount he would have earned selling <u>both</u> new <u>and</u> used automobiles, may not be great. Nonetheless, the minimal nature of recoverable damages is not an issue at this point in the proceedings. Accordingly, the court proceeds to an analysis of whether the adverse employment action taken against plaintiff was the product of racial

discrimination.

## C.   **Analysis**

Plaintiff first claims he has produced direct evidence of racial discrimination.   He cites several statements made by Hamilton in support of such a claim:  Hamilton's statement that if plaintiff and Earnest Meadows continued to socialize together during work time, the end result would be "two unemployed black asses"; Hamilton's reference to plaintiff's footwear as "pimp daddy shoes"; and, Hamilton's directive to plaintiff that he "take [his] black ass down the road."

None of those statements qualify as direct evidence of race discrimination regarding defendant's decision to reassign plaintiff to the sale of used automobiles.[17]  The first statement is a threat,

---

[17] Only the most blatant remarks demonstrating a discriminatory animus are deemed to constitute direct evidence, however.  *See generally* Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1359 (11th Cir. 1999); Wright v. Southland Corporation, 187 F.3d 1287, 1293-1303 (11th Cir. 1999).  Direct evidence is evidence which, if believed, proves the existence of a fact in issue without the need of an inference or a presumption.  *See, e.g.*, Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require ... an inferential leap between fact and conclusion."); Black's Law Dictionary 577 (7th ed. 1999) (defining direct evidence as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption").

In a recent case involving a claim of age discrimination, the Eleventh Circuit provided the following example of direct evidence:  "An example of direct evidence would be a management memorandum saying, 'Fire [plaintiff] — he is too old.'" *Damon*, 196 F.3d at 1359 (deeming the direct evidence standard "rigorous") (citing Earley v. Champion International Corporation, 907 F.2d 1077, 1082 (11th Cir. 1990) (other internal quotation marks omitted)).   "If a plaintiff can provide direct evidence of discriminatory intent, then the employer must prove by a preponderance of the evidence that the same employment decision would have been made in the absence of the discriminatory intent."  Standard v. A.B.E.L.

which never came to fruition, and has nothing to do with plaintiff's change in job assignments. Plaintiff has not argued that his association with Meadows at the work place somehow led to his transfer. The second statement, even if a jury were to conclude that it connoted a race-based stereotype, nevertheless has not been linked to the transfer decision. The last statement occurred long after the transfer decision, and was made in response to plaintiff's accusations that Hamilton was arrogant and disrespectful.

A factually similar case is *Jones v. Winn-Dixie Stores, Inc.*, 75 F. Supp. 2d 1357 (S.D. Fla. 1999), *aff'd*, 203 F.3d 842 (11th Cir. 1999), where the plaintiff contended direct evidence of racial discrimination existed in light of one co-worker's statement that "he was going to get the Plaintiff's 'black ass out of the store' because he was a troublemaker" and another co-worker's pronounced opinion that "there were too many blacks working at the store." *Id*. at 1362. The district court disagreed, finding that "neither of these alleged statements was made in the decisionmaking process," and that "both statements require an inference before it can be said that the speaker had discriminatory intent." *Id*. In sum, plaintiff's attempt to directly establish race discrimination

Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

through the above statements fails, because a causal link between the disadvantageous transfer and a criticized protected characteristic is absent. *See Wright*, 187 F.3d at 1298 ("Rather, the cases are more consistent with a definition of 'direct evidence' as evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic.").

Plaintiff must make his case, therefore, by a proffer of circumstantial evidence.[18]  To establish a *prima facie* case in the context of a disadvantageous transfer or unfavorable change in job

---

[18] Circumstantial evidence of race discrimination, on the other hand, is evidence "based on inference and not on personal knowledge or observation." Black's Law Dictionary 576 (7th ed. 1999).  Use of circumstantial evidence is "[t]he distinct method of proof in employment discrimination cases, relying on presumptions and shifting burdens of articulation and production."  Sheridan v. E.I. DuPont de NeMours & Company, 100 F.3d 1061, 1071 (3d Cir. 1996) (*en banc*).

A plaintiff's effort at establishing a defendant's discriminatory intent through an offer of circumstantial evidence is subject to the burden-shifting framework originally articulated by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under that now familiar tripartite scheme, plaintiff has the initial burden of establishing a *prima facie* case of discrimination.  If successful, the burden of production shifts to defendant, who must articulate a legitimate, nondiscriminatory reason for the challenged employment action.  If that burden is met, plaintiff must produce evidence indicating that defendant's stated reason is mere pretext for unlawful discrimination.  *See* Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (noting that plaintiff must put on enough evidence to permit a jury to reasonably "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct'") (quoting Cooper-Houston v. Southern Railway Company, 37 F.3d 603, 605 (11th Cir. 1994)), *cert. denied sub nom.*, Combs v. Meadowcraft Company, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998).  Plaintiff carries the ultimate burden of showing that the defendant intentionally discriminated against him. *See Wright*, 187 F.3d at 1292 ("In sum, the plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic.").

assignments, plaintiff must prove that:   (1) he belongs to a protected class; (2) his employer treated similarly situated employees outside the protected class more favorably; and, (3) he was qualified to do the job from which he was transferred.  *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).[19]  There is no doubt that plaintiff satisfies the first criterion.  Further, viewing the facts in a light most favorable to plaintiff, he has established qualification for the job from which he was transferred.   The crucial question thus becomes whether similarly situated Caucasian salespersons were treated more favorably than plaintiff. *See Alexander v. Fulton County, Georgia*, 207 F.3d 1303, 1344 (11th Cir. 2000) ("First, a plaintiff must make a prima facie case of discrimination by showing that he was treated differently than were similarly situated [Caucasians] with respect to transfers and assignments.").

The evidence does indicate that plaintiff was treated in a manner distinct from certain similarly situated Caucasian employees.  It is not entirely clear when plaintiff was informed he could sell only used automobiles.  This court, upon examination of

---

[19] Proof that the transfer or change in job assignments amounted to an adverse employment action also is an element of the *prima facie* case.  Because the court addressed that issue as a threshold matter, *see supra* pages 15-19, it treats that requirement as already satisfied by plaintiff, and moves on to the other elements.

the entire record, concludes such action was taken against plaintiff in late April of 1999. Plaintiff made eight sales during that month.[20] A number of Caucasian salespersons sold an equal or lesser number of automobiles during the same month: *e.g.*, Barry Underwood (8 sales), Mike Waldrop (7 1/2 sales), Kathy Horne (6 1/2 sales), and Kelly Peak (6 sales).[21] According to plaintiff, however, he was the only salesperson eventually limited to the sale of used automobiles. Underwood, Waldrop, Horne, and Peak continued selling both new and used vehicles. Because plaintiff has satisfied all the requisite elements for his *prima facie* case of race discrimination, the court next turns to defendant's legitimate, nondiscriminatory reason for restricting plaintiff's sales potential to used automobiles.

Defendant avers that the personality conflict between Hamilton and plaintiff required they cease working together. Further, Hamilton claimed that plaintiff was not capable of selling new automobiles.[22] Plaintiff must show that those proffered reasons for

---

[20] *See* Exhibit 2 to the deposition of Robert Maloy, attached as Exhibit B to defendant's evidentiary submission in opposition to summary judgment.

[21] *See id.*

[22] *See* Maloy deposition at 19-20:

    Q.    Okay.   All right.   Do you recall the reason why [plaintiff] was moved from new car sales to used cars?

    A.    Yes.   He and Mr. Hamilton had had a -- kind of a

altering his job assignments are pretextual, and were stated by defendant in an attempt to mask unlawful race discrimination. *See Combs*, 106 F.3d at 1528 ("In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.").

Plaintiff has made this showing. While this court recognizes that the motive behind enactment of federal employment discrimination statutes was not that of creating a "general civility code," *see Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (Title VII case), the circumstances surrounding plaintiff's reassignment to the used car sales department create a jury issue regarding whether Hamilton's alleged racial prejudice precipitated his "personality

---

personality conflict.

Q.   So was it Mr. Hamilton's decision to move Mr. Hicks to used cars?

A.   Yes.  Well, it wasn't his decision to move him.  He had determined that Tim was not capable of selling new cars the way he wanted him to, and Dewayne offered to take him on his team at that time.

conflict" with plaintiff.  A number of the incidents complained of by plaintiff with respect to Hamilton do not appear to be race-related:  *e.g.*, Hamilton's criticism of plaintiff's shirt; Hamilton's tirade relating to the off day taken by plaintiff; and Hamilton's general tendency to look at plaintiff with disgust. Others, however, appear to be motivated by racial considerations: *e.g.*, Hamilton's separation of plaintiff and Meadows; the accompanying threat that there would be "two unemployed black asses" if they did not obey his orders; and, Hamilton's statement that plaintiff should take his "black ass on down the road."  It is the fact finder's duty to sort out defendant's motives in limiting plaintiff to the sale of used automobiles.  In sum, plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Sheridan*, 100 F.3d at 1072 (citation and internal quotation marks omitted).  Accordingly, plaintiff's claim of race discrimination relating to defendant's decision to limit him to the sale of used automobiles survives summary judgment, and shall proceed to trial.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is due to be granted in part and denied in part. All of plaintiff's § 1981 claims arising out of his separation from employment with defendant, including unlawful termination and constructive discharge, are due to be dismissed. Any § 1981 claim based on a racially hostile work environment also is due to be dismissed. Plaintiff's § 1981 claim relating to defendant's restriction of his sales to used automobiles only, on the other hand, shall proceed to trial. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 27th day of June, 2000.

_____
United States District Judge

26